Ely Grinvald, Esq.  (SBN 285475)
2355 Westwood Blvd., #562
Los Angeles, CA 90064
Phone: (310) 405-5684
grinvaldely@gmail.com

*Attorney for Plaintiff,*
*Gloria Alvarado*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**GLORIA ALVARADO,**

                              **Plaintiff,**

                    **v.**

**MIDLAND CREDIT MANAGEMENT, INC., CELTIC BANK, and SYNCHRONY BANK,**

                              **Defendants.**

Case No: 8:25-cv-02356-DOC-DFM

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Gloria Alvarado, by and through the undersigned counsel, complains, states, and alleges against defendants Midland Credit Management, Inc., Celtic Bank, and Synchrony Bank, as follows:

## INTRODUCTION

1.     This complaint includes conduct of three separate, unrelated accounts related to violations of federal and state law. Plaintiff asserts all claims within the confines of this same action for the purposes of judicial economy because Plaintiff and Midland Credit Management, Inc. are the same parties for all three of the accounts. As such, Plaintiff seeks separate damages for each account.

2.    This is an action to recover damages for negligence, substantially assisting violations of the Fair Debt Collection Practices Act, Rosenthal Fair Debt Collection Practices Act, and Fair Credit Reporting Act, and violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* (the "FDCPA"), the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788, *et seq.* (the "RFDCPA"), the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*, and the Consumer Credit Reporting Agencies Act ("CCRAA"), Cal. Civ. Code § 1785 *et seq.*

**FDCPA**

3.    In 1977, Congress enacted the Fair Debt Collection Practices Act, codified at 15 USC §§ 1692 *et seq.*, in response to the "abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a).  At that time, Congress was concerned that "abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy."  *Id.*  Congress concluded that "existing laws . . . [we]re inadequate to protect consumers," and that "the effective collection of debts" does not require "misrepresentation or other abusive debt collection practices." 15 U.S.C. §§ 1692(b) and (c).

4.    Congress explained that the purpose of the Act was not only to eliminate abusive debt collection practices, but also to "ensure that those debt collectors who

refrain from using abusive debt collection practices are not competitively disadvantaged." *Id.*, § 1692(e). After determining that the existing consumer protection laws were inadequate, Congress gave consumers a private cause of action against debt collectors who failed to comply with the Act. *Id.*, § 1692k.

5.      In determining whether a collection letter violates the FDCPA, courts in the Ninth Circuit apply the least sophisticated consumer standard, "[i]f the least sophisticated debtor would likely be misled by a communication from a debt collector, the debt collector has violated the [FDCPA]." *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 934 (9th Cir. 2007).

6.      The FDCPA does not ordinarily require proof of an intentional violation, and is considered a strict liability statute, whereby a single violation is sufficient to establish civil liability against a debt collector.

## **FCRA**

7.      The FCRA is a federal statute that broadly regulates the credit reporting agencies and furnishers of credit information. Among other things, the FCRA prohibits credit reporting agencies and furnishers from reporting incomplete or inaccurate information on a consumer's credit report.

8.      Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied

for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

9.    While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

10.    Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

11.    Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

12.    The FCRA is intended to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

## **CCRAA**

13.    The California legislature also determined that accurate credit reporting is vital and enacted the Consumer Credit Reporting Agencies Act.

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

**JURISDICTION AND VENUE**

14.    This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, 15 U.S.C. § 1692k(d), and 15 U.S.C. § 1681(p).

15.    The Court has supplemental jurisdiction of any state law claims pursuant to 28 U.S.C. § 1367 because the state law claims arise from a common nucleus of operative facts.

16.    This Court has jurisdiction over defendants Midland Credit Management, Inc., Celtic Bank, and Synchrony Bank because defendants regularly conduct and transact business in the State of California, and are located in this Judicial District and/or have sufficient minimum contacts in this Judicial District.

17.    Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) because a substantial part of the conduct complained of herein occurred in this Judicial District.

**PARTIES**

18.    Plaintiff Gloria Alvarado ("Plaintiff") is a natural person who is a citizen of the State of California, residing in Adelanto, San Bernardino County, California.

19.    Plaintiff is a "consumer" as that term defined by 15 U.S.C. § 1692a(3).

20.    Plaintiff is a "person" as that term is defined by Cal. Civ. Code § 1788.2.(g).

21.    Plaintiff is a "consumer" as that term is defined by the FCRA.

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

22.    Defendant Midland Credit Management, Inc. ("MCM") is a company existing under the laws of the State of California, with its principal place of business in San Diego, California. At all times relevant to this Complaint, MCM has transacted business in the State of California and within this District.

23.    MCM has transacted business within this state as is more fully set forth hereinafter in this Complaint.

24.    MCM regularly collects or attempts to collect debts asserted to be owed to others.

25.    MCM is regularly engaged, for profit, in the collection of debts allegedly owed by consumers.

26.    The principal purpose of MCM's business is the collection of such debts.

27.    MCM uses instrumentalities of interstate commerce, including telephones and the mails, in furtherance of its debt collection business.

28.    MCM is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

29.    MCM is a "debt collector" as that term is defined by Cal. Civ. Code § 1788.2(c).

30.    MCM is a "furnisher of information" as that term is defined by the FCRA, 15 U.S.C. §1681s-2(b).

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

31.     Defendant Celtic Bank ("Celtic Bank") is a Utah-chartered industrial bank headquartered in Salt Lake City, Utah, doing business in the State of California and within this District.

32.     Celtic Bank is a "debt collector" as that term is defined by Cal. Civ. Code § 1788.2(c).

33.     Celtic Bank is a "person" as that term is defined by Cal. Civ. Code § 1788.2(g).

34.     Defendant Synchrony Bank ("Synchrony Bank") is a wholly owned subsidiary of Synchrony Financial, a Delaware corporation and consumer financial services company headquartered in Stanford, Connecticut, doing business in the State of California and within this District.

35.     Synchrony Bank is a "debt collector" as that term is defined by Cal. Civ. Code § 1788.2(c).

36.     Synchrony Bank is a "person" as that term is defined by Cal. Civ. Code § 1788.2(g).

## **FACTUAL ALLEGATIONS**

37.     Equifax, Experian, and TransUnion (collectively, the "CRAs") are the three major consumer reporting agencies in the United States, and regularly publish and distribute credit information about Plaintiff and other consumers through the sale of consumer reports.

38.     The reports of CRAs generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

39.     The CRAs obtain consumer information from various sources. Some consumer information is sent directly to the credit reporting agencies by furnishers, and other information is independently gathered by credit reporting agencies from third party providers, vendors, or repositories, like computerized reporting services like PACER and Lexis-Nexis.

40.     The majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from credit reporting agencies to make lending decisions.

41.     Those institutions also use FICO Scores, and other proprietary third-

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the CRAs' consumer reports.

42.    Accounts in collection is the biggest factor use in FICO Scores, and consumers with collections on their credit reports likely have lower credit scores than consumers who have no collections.

43.    The information credit reporting agencies include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

44.    FICO Scores are calculated using information contained in the consumer's report.

45.    FICO and other third-party algorithms use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

46.    FICO Scores factor in the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

47.    "Payment history" refers to whether a consumer has paid his[er] or his[er] bills in the past, and whether these payments have been timely, late, or missed.

In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

48.     The "amount of debt" a consumer owes has a major impact on their credit score. When a credit reporting agency reports a debt as outstanding when it is in fact discharged, the credit reporting agency indicates that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

49.     Lenders also consider a consumer's debt-to-income ratio before deciding to extend credit or approve financing terms.

50.     Banks, landlords, credit card issuers, employers, insurance companies, utility providers, among others, all use credit scores to assess how likely a consumer is to make timely payments. A higher credit score leads to better loan terms and lower interest rates, while a lower credit score leads to worse loan terms, higher interest rates, and/or credit denials.

51.     Debt-to-income compares the total amount a consumer owes to the total amount a consumer earns.

52.     A consumer's income, however, is not included in their consumer report; only their amount of debt is.

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

53.     The higher the amount of reported debt that a consumer has, or appears

to have, the worse the consumer's debt-to-income will be, and the more difficult it

will be for a consumer to obtain credit and favorable credit terms (e.g., higher interest

and lower credit limits).

54.     The impact of debt and debt collection is not just financial. In fact, the

Federal Reserve Bank of Atlanta published a study, which was the joint collaboration

of economists Laura Argys, Andrew Friedson, and Federal Reserve economist M.

Melinda Pitts, that directly linked financial strain from higher debt levels to higher

death rates among American consumers.[1] The study also found, the impact of

delinquency is most pronounced in the short-term as individuals are far more likely

to die as a result of an immediate debt shock than in response to lingering debt.[2] As

part of the study, the economists analyzed credit balance and delinquency data

maintained by the Federal Reserve.[3]  The results, while not surprising, showed that

individuals with bad credit and higher amounts of delinquent debt, had a higher

probability of death than those with better credit and smaller amounts of delinquent

debt.[4]

55.     MCM is a wholly-owned subsidiary of Encore Capital Group, which

[1] Laura M. Argys, Andrew Friedson, & M. Melinda Pitts, *Killer Debt: The Impact of Debt on Mortality*, FRB Atlanta Working Paper No. 2016-14 (2016).

[2] *Id*. at 14.

[3] *Id*. at 3.

[4] *Id*. at 4.

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

claims to be one of the largest debt purchasers in the world.  In 2024, MCM claims

it purchased record volumes of defaulted consumer debt, totaling $1 billion and

collected $1.6 billion from consumers. At the end of 2024, MCM claims that MCM's

estimated remaining debt collection portfolio exceeded $5 billion.

56.    According to data provided by the CFPB, consumer complaints about

debt collectors attempting to collect money not actually owed by the consumer are

by far the most common of all complaints received by the CFPB every year, aside

from credit reporting.  MCM is near the top for the entire country in terms of the

volume of such complaints against debt collectors.

57.    For instance, in 2015, the CFPB entered into a Consent Order with

MCM, and related entities, for violations of the law, including the FDCPA, which

required MCM, and related entities, to pay more than $42,000,000 in restitution and

$10,000,000 civil penalty for i) failing to investigate disputes made by consumers, ii)

forcing consumers to restart the dispute process each time a debt was transferred to

a different debt collector, iii) falsely representing to consumers information regarding

a debt when it was known or had reason to believe the information to be inaccurate,

iv) engaging in scattershot litigation, v) preventing debt collectors from obtaining

account-level documentation regarding consumer debts, vi) submitting affidavits to

courts around the country with false or misleading testimony, vii) submitting

affidavits to court around the country with false or misleading statements by sellers

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

of the debt, viii) threatening and filing lawsuits to collect time-barred debts, ix) training collectors to create urgency when collecting time-barred debt over the telephone, and x) sending settlement offers to collect time-barred debts without informing the consumer that the debt was time-barred.

58.     In 2018, 42 States Attorneys General entered into a settlement with MCM, and related entities, for $6,000,000 related to deceptive debt collection and litigation practices, such as filing affidavits in courts across the country when the affiant lacked personal knowledge related to the statements in the affidavit and did not review the relevant files, also known as robo-signing.

59.     Then, in 2020, the CFPB filed an action in the U.S. District Court for Southern District of California against MCM, and related entities, asserting MCM, and related entities, failed to comply with the 2015 Consent Order by continuing to engaging in the prohibited conduct in the 2015 Consent Order. *See Bureau of Consumer Financial Protection v. Encore Capital Group, Inc., et al.*, No. 20-cv-1750-GPC-KSC (S.D. Cal. Oct. 16, 2020) (entering stipulation of final judgment.)

60.     Despite the foregoing, creditors, including First Bank & Trust ("First Bank"), Celtic Bank, and Synchrony Bank, regularly transfer portfolios of debts purportedly owed by consumers to MCM for purposes of collection.

61.     Thereafter, in an attempt to collect the alleged debts, MCM began furnishing negative information to the CRAs regarding three separate accounts with

account number 323134XXX, 323393XXX, and 329146XXX.

62.    Plaintiff became aware of MCM's credit reporting.

63.    However, Plaintiff does not owe MCM any money.

64.    In fact, Plaintiff was never involved in any transaction with MCM, and never entered into any contract with MCM.  Plaintiff was never indebted to MCM. MCM never extended credit to Plaintiff. MCM does not possess competent proof that Plaintiff owes any money to MCM.

65.    MCM holds no legal right, title, or interest in any money owed by Plaintiff.

66.    Thereafter, Plaintiff spent time and energy obtaining a copy of her credit reports.

67.    In fact, Plaintiff spent time and energy reviewing her credit reports.

68.    First Bank was reporting negative information regarding the First Bank account with an account number of 523081007190****.

69.    In addition, First Bank was reporting an open date of July 25, 2021.

70.    Moreover, First Bank was reporting a charge-off balance in the amount of $1,174.00.

71.    After First Bank began reporting negative information regarding the First Bank account, Plaintiff's credit score and credit worthiness was negatively impacted.

72.    Then, MCM began reporting negative information regarding a First Bank account with an account number of 323134XXX, but Plaintiff never had an account with First Bank with an account number of 323134XXX.

73.    In addition, MCM was reporting an open date of June 29, 2023; however, Plaintiff never opened an account with First Bank on June 29, 2023.

74.    Moreover, MCM was reporting a balance in the amount of $1,755.00, but Plaintiff believes the charge-off balance was only $1,174.00 for the only First Bank account Plaintiff had.

75.    In fact, as of the date of the filing of this amended complaint, MCM is still reporting information regarding a First Bank account, but Plaintiff does not owe any money to First Bank or MCM regarding the account.

76.    At some point, Celtic Bank began furnishing negative information to the CRAs regarding the Celtic Bank account, but thereafter, ceased reporting negative information.

77.    After Celtic Bank began reporting negative information regarding the Celtic Bank account, Plaintiff's credit score and credit worthiness was negatively impacted.

78.    Then, MCM began reporting negative information regarding a Celtic Bank account with an account number of 323393XXX, but Plaintiff never had an account with Celtic Bank with an account number of 323393XXX.

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

79.     In addition, MCM was reporting an open date of July 27, 2023; however, Plaintiff never opened an account with Celtic Bank on July 27, 2023.

80.     At some point, Synchrony Bank began furnishing negative information to the CRAs regarding the Synchrony Bank account, but thereafter, ceased reporting negative information.

81.     After Synchrony Bank began reporting negative information regarding the Synchrony Bank account, Plaintiff's credit score and credit worthiness was negatively impacted.

82.     Then, MCM began reporting negative information regarding a Synchrony Bank account with an account number of 32914XXXX, but Plaintiff never had an account with Synchrony Bank with an account number of 32914XXXX.

83.     In addition, MCM was reporting an open date of September 25, 2024; however, Plaintiff never opened an account with Synchrony Bank on September 25, 2024.

84.     Plaintiff was misled and/or deceived by MCM's credit reporting because Plaintiff never had any account with any creditor with an account number of 323134XXX, 323393XXX, or 329146XXX.

85.     Plaintiff did not recognize the account numbers that MCM was reporting to the CRAs.

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

86.    Plaintiff was misled and/or deceived by MCM's credit reporting because Plaintiff never opened an account with First Bank, Celtic Bank, and Synchrony Bank, on June 29, 2023, July 27, 2023, or September 25, 2024, respectively.

87.    The algorithm of the credit reporting agencies is coded in such a way that negative reporting impacts a consumer's score more than positive reporting.

88.    The algorithm of the credit reporting agencies is coded in such a way that a consumer's credit score does not increase to the same degree as the consumer's credit score decreased when a negative account is deleted.

89.    When MCM began reporting the First Bank account, Plaintiff's credit score and creditworthiness was negatively impacted a second time because the algorithm of the credit reporting agencies understood MCM's reporting to be a new negative report.

90.    When MCM began reporting the Celtic Bank account and Synchrony Bank account after Celtic Bank and Synchrony Bank ceased reporting, Plaintiff's credit score and creditworthiness was negatively impacted a second time, in part, because the algorithm of the credit reporting agencies understood MCM's reporting to be a new negative report.

91.    MCM knows the foregoing, and uses credit reporting as part of its collection practices and as a way to coerce consumers into paying MCM for debts

not owed to MCM, in order to increase profits for MCM.

92.    MCM's reporting negatively impacted Plaintiff's credit.

93.    MCM's    credit    reporting    negatively    impacted    Plaintiff's
creditworthiness.

94.    MCM's credit reporting was viewed by third parties.

95.    As a result of MCM's credit reporting, Plaintiff lost access to credit.

96.    MCM's subsequent and duplicate credit reporting of the First Bank
account, and credit reporting of the Celtic Bank account and Synchrony Bank account
after Celtic Bank and Synchrony Bank already ceased reporting is false, misleading,
and/or deceptive.

97.    MCM's subsequent and duplicate credit reporting of the First Bank
account, and credit reporting of the Celtic Bank account and Synchrony Bank account
after Celtic Bank and Synchrony Bank already ceased reporting is unfair and/or
unconscionable.

98.    MCM's subsequent and duplicate credit reporting of the First Bank
account, and credit reporting of the Celtic Bank account and Synchrony Bank account
after Celtic Bank and Synchrony Bank already ceased reporting is conduct the natural
consequence of which is to harass, abuse, and/or oppress.

99.    Then, Plaintiff spent time learning about her rights to dispute inaccurate
and/or misleading information being reported on her credit reports.

100.    In fact, on or about August 12, 2025, Plaintiff sent a written dispute to Equifax, Experian, and TransUnion regarding MCM's reporting via U.S.P.S. Certified Mail.

101.    In the relevant part, Plaintiff dispute stated:

**FB&T/MERCURY**
**523081007190\*\*\*\***

My reports indicate that this account was closed. In addition, it appears Midland Credit Management. is also reporting this same account. The duplicate reporting is misleading and has negatively impacted my credit score and creditworthiness.

**MIDLAND CREDIT MANAGEMENT**
**323134XXX**

I have never had an account with Midland Credit Management. I have never applied for credit with Midland Credit Management. I have never received credit from Midland Credit Management. I have never heard of Midland Credit Management. I do not owe any money to Midland Credit Management. My reports indicate an open date of June 29, 2023, however, I never opened an account with this entity. It is believed this account relates to a First Bank Trust account. First Bank Trust is already reporting this account with a different open date, different account number, and different amount. In addition, my Equifax and TransUnion reports are reporting this as an "Open Account." This is false. The duplicate reporting is misleading and has negatively impacted my credit score and creditworthiness.

**MIDLAND CREDIT MANAGEMENT**
**323393XXX**

I have never had an account with Midland Credit Management. I have never applied for credit with Midland Credit Management. I have never received credit from Midland Credit Management. I have never heard of Midland Credit Management. I do not owe any money to Midland Credit Management. My reports indicate an open date of July 27, 2023,

however, I never opened an account with this entity. In addition, my Equifax and TransUnion reports are reporting this as an "Open Account." This is false.

## MIDLAND CREDIT MANAGEMENT
### 329146XXX

I have never had an account with Midland Credit Management. I have never applied for credit with Midland Credit Management. I have never received credit from Midland Credit Management. I have never heard of Midland Credit Management. I do not owe any money to Midland Credit Management. My reports indicate an open date of September 25, 2024, however, I never opened an account with this entity. In addition, my Equifax and TransUnion reports are reporting this as an "Open Account." This is false.

102.   Plaintiff spent approximately thirty (30) minutes traveling to and from the U.S. Post Office and incurred a cost $18.24 mailing the dispute letters to the CRAs.

103.   Plaintiff's dispute notified Equifax, Experian, and TransUnion that the information reported by MCM was inaccurate and/or misleading.

104.   Once Equifax, Experian, and TransUnion each received the dispute from Plaintiff, each were required to provide notice of such dispute and request for re-investigation to the furnisher, in this case MCM.

105.   Upon information and belief, Equifax, Experian, and TransUnion each transmitted notice of the dispute to MCM via an Automated Credit Dispute Verification form ("ACDV").

106.   MCM was required to investigate Plaintiff's dispute in full upon receipt

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

of the ACDVs, and by extension, notice of the inaccuracy.

107.   After receiving this notice, in any subsequent voluntary reporting, MCM must then delete the tradeline or update the tradeline to correct inaccurate information, as well as include the dispute notation on the account.

108.   Then, on or about September 11, 2025, and September 18, 2025, Plaintiff again spent time and energy to obtained a copy of her Equifax, Experian, and TransUnion credit reports.

109.   In fact, Plaintiff again spent time and energy reviewing her credit reports.

110.   After receipt of Plaintiff's disputes, MCM rereported the accounts as accurate on Plaintiff's credit bureau reports.

111.   MCM failed to delete the inaccurate and/misleading account information.

112.   MCM failed to investigate or otherwise verify Plaintiff's dispute before MCM voluntarily re-reporting the accounts.

113.   MCM lacks sufficient policies and procedures to investigate consumer disputes, like the dispute described herein.

114.   All of MCM's actions under the FCRA complained of herein occurred within two years of the date of this Complaint.

115.   Plaintiff suffered injury-in-fact by being subjected to inaccurate, unfair,

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

and abusive practices of MCM.

116.   Plaintiff suffered actual harm by being the target of inaccurate and/or misleading credit reporting by MCM.

117.   MCM's conduct is unfair and/or unconscionable because MCM knows that negative reporting and accounts in collection is the biggest factor in scoring a consumer's creditworthiness, and an account being reported twice, in this case, First Bank and MCM, and subsequent to when the creditor has already deleted the negative account, in this case, Celtic and MCM, and Synchrony and MCM, negatively impacts a consumer's credit score and creditworthiness.

118.   Plaintiff will continue to suffer harm as a result of MCM's inaccurate and/or misleading reporting because the algorithm of the CRAs does not provide increases in a consumer's credit score to the same degree as the CRAs decrease a consumer's credit score.

119.   Plaintiff will continue to suffer harm as a result of MCM's inaccurate and/or misleading reporting because, today, a credit score can determine a consumer's ability to secure housing, purchase a car, obtain employment, access essential financial services, among other things.

120.   Plaintiff will continue to suffer harm as a result of MCM's inaccurate and/or misleading reporting because Plaintiff will no longer be able to trust the accuracy and integrity of the information reported by the CRAs.

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

121.   Plaintiff has suffered actual harm based on her costs and time of repairing her credit, pain and suffering, embarrassment, inconvenience, lost economic opportunity, loss of incidental time, frustration, emotional distress, mental anguish, fear of personal and financial safety and security, and attorney's fees.

122.   Plaintiff has suffered damages resulting from loss of credit, higher rates when applying for an auto loan through Westlake Financial, and higher auto insurance premiums from State Farm.

123.   In fact, Plaintiff also suffered damages because Plaintiff was deterred from applying for credit as a result of her credit score and embarrassment associated with the same, including, but not limited to, refinancing her home mortgage.

124.   In fact, Plaintiff suffered damages because Plaintiff feared applying for credit would further damage  her credit score due to hard inquiries that result from applying for credit.

125.   Plaintiff has suffered actual harm based on her time reviewing her credit, pain and suffering, embarrassment, inconvenience, lost economic opportunity, loss of incidental time, frustration, emotional distress, mental anguish, fear of personal and financial safety and security, and attorney's fees.

126.   Plaintiff's injury-in-fact is traceable to the actions or inactions of MCM, Celtic Bank, and Synchrony Bank.

127.   Plaintiff's injury-in-fact is likely to be redressed by a favorable decision

in this Court.

128.   As a result of MCM, Celtic, and Synchrony's conduct, Plaintiff suffered anxiety, stress, and feared that Plaintiff would lose access to credit and/or need to pay higher interest rates.

129.   Plaintiff suffered damages because Plaintiff has been subjected to a higher risk of death as a result of the inaccurate and/or misleading reporting.

130.   As a result of MCM, Celtic, and Synchrony's conduct, Plaintiff suffered emotional distress that developed into headaches and migraines.

131.   Aa result of MCM, Celtic, and Synchrony's conduct, Plaintiff suffered severe emotional distress, which caused Plaintiff to seek medical treatment due to anxiety, lack of ability to sleep, weight gain, lack of motivation, lack of focus, depression, and acid reflux.

132.   The acts of Defendants as described in this Complaint were performed by Defendants or on Defendants' behalf by their owners, officers, agents, and/or employees acting within the scope of their actual or apparent authority.  As such, all references to MCM in this Complaint shall mean MCM or their owners, officers, agents, and/or employees; all references to Celtic Bank in this Complaint shall mean Celtic Bank or their owners, officers, agents, and/or employees; and all references to Synchrony Bank in this Complaint shall mean Synchrony Bank or their owners, officers, agents, and/or employees.

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

133.   MCM, Celtic Bank, and Synchrony Bank's conduct as described in this Complaint was willful, with the purpose to either harm Plaintiff or with reckless disregard for the harm to Plaintiff that could result from MCM, Celtic Bank, and Synchrony Bank's conduct.

134.   But for MCM, Celtic Bank, and Synchrony Bank's actions, Plaintiff would not have had to spend time searching her records.

135.   But for MCM, Celtic Bank, and Synchrony Bank's actions, Plaintiff would not have had to spend time discussing this matter with her attorneys.

136.   But for MCM, Celtic Bank, and Synchrony Bank's actions, Plaintiff would not have had to spend time reviewing her credit reports.

137.   But for MCM, Celtic Bank, and Synchrony Bank's actions, Plaintiff would not have become aggravated, frustrated, worried, fearful, and distressed.

138.   Plaintiff's anger and frustration continue to this day.

139.   Plaintiff justifiably fears that, absent this Court's intervention, MCM will continue to use abusive, deceptive, unfair, and unlawful means in their attempts to collect the alleged debt and other alleged debts.

140.   Plaintiff justifiably fears that, absent this Court's intervention, MCM will ultimately cause Plaintiff further unwarranted economic harm.

141.   Plaintiff justifiably fears that, absent this Court's intervention, MCM will ultimately cause Plaintiff further unwarranted harm to Plaintiff's credit rating.

142.    Plaintiff justifiably fears that, absent this Court's intervention, Plaintiff will need to incur time and expense defending a frivolous collection lawsuit from MCM.

143.    MCM communications caused Plaintiff wasted time, lost time, loss of enjoyment of life and the potential incurrence of fees.

144.    MCM infringed upon Plaintiff's right to seclusion.

145.    MCM infringed upon Plaintiff's right to quiet enjoyment of life.

146.    MCM infringed upon Plaintiff's right to truthful information from debt collectors.

147.    MCM infringed upon Plaintiff's right not to be harassed and oppressed by debt collectors.

148.    MCM's conduct as described herein caused Plaintiff to suffer emotional distress, fear, confusion, anxiety, aggravation, annoyance, loss of time, loss of enjoyment of life, and the incurrence of attorneys' fees.

149.    Plaintiff justifiably fears that, absent this Court's intervention, MCM will continue to use abusive, deceptive, unfair, and unlawful means in their attempts to collect the alleged debt and other alleged debts.

150.    A favorable decision herein would serve to deter MCM, Celtic Bank, and Synchrony Bank, from further similar conduct.

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

## FIRST COUNT
### Violation of 15 U.S.C. §§ 1692d, 1692e, 1692e(8), 1692e(10), and 1692f

151.    Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

152.    The Plaintiff is a "consumer" as that term defined by the FDCPA.

153.    MCM is a "debt collector" as that term is defined by the FDCPA.

154.    The money sought from Plaintiff is a "debt" as that term is defined by the FDCPA.

155.    Each report to the credit reporting agencies is a "communication" as that term is defined by the FDCPA.

156.    The actions described herein constitute "an attempt to collect a debt" or "were taken in connection with an attempt to collect a debt" within the meaning of the FDCPA.

157.    15 U.S.C. § 1692d provides, generally, that a debt collector may not engage in conduct the natural consequence of which is to harass, abuse, and/or oppress.

158.    15 U.S.C. § 1692e provides, generally, that a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.

159.    15 U.S.C. § 1692e(8) prohibits a debt collector from communicating or threatening to communicate to any person credit information which is known or

which should be known to be false, including the failure to communicate that a disputed debt is disputed.

160.  15 U.S.C. § 1692e(10) prohibits the use of any false representation or deceptive means to collect or attempt to collect any debt.

161.  15 U.S.C. § 1692f prohibits using unfair or unconscionable means to collect or attempt to collect any debt.

162.  MCM violated the FDCPA by reporting information regarding the Celtic Bank account, Synchrony Bank account, and First Bank account, when Plaintiff did not owe MCM any money.

163.  MCM knew or should have known the credit reporting was false, misleading, and/or deceptive.

164.  MCM misrepresented the character, amount, and legal status of the Celtic Bank account, Synchrony Bank account, and First Bank account, when it reported the alleged debt to the credit reporting agencies.

165.  MCM violated the FDCPA by using false representation or deceptive means when it reported information to the CRAs that Plaintiff owed money for a First Bank account, Celtic Bank account, and Synchrony Bank account, with an account number of 323134XXX, 323393XXX, and 329146XXX, respectively.

166.  MCM violated the FDCPA by using false representation or deceptive means when it reported to the CRAs that Plaintiff owed money for a First Bank

account, Celtic Bank account, and Synchrony Bank account, with an open date of June 29, 2023, July 27, 2023, or September 25, 2024, respectively.

167.  MCM violated the FDCPA by engaging in conduct the natural consequence of which is to harass, abuse, and/or oppress by causing duplicate reporting of the First Bank account, and reporting the Celtic Bank account and Synchrony Bank account the credit reporting agencies after Celtic Bank and Synchrony Bank had ceased reporting the Celtic Bank account and Synchrony Bank account, causing Plaintiff's credit score and creditworthiness to be negatively impacted for a second time for the same account.

168.  MCM violated the FDCPA by engaging in conduct the natural consequence of which is to harass, abuse, and/or oppress by reporting information regarding the First Bank account, Celtic Bank account, and Synchrony Bank account, when Plaintiff did not owe MCM any money.

169.  MCM violated the FDCPA by using unfair and/or unconscionable means by causing duplicate reporting of the First Bank account, and reporting the Celtic Bank account and Synchrony Bank account to the credit reporting agencies after Celtic Bank and Synchrony Bank had ceased reporting the Celtic Bank account and Synchrony Bank account, causing Plaintiff's credit score and creditworthiness to be negatively impacted for a second time for the same account.

170.  MCM violated the FDCPA by using unfair and/or unconscionable

means by reporting information regarding the First Bank account, Celtic Bank account, and Synchrony Bank account, when Plaintiff did not owe MCM any money.

171.    For the foregoing reasons, MCM violated 15 U.S.C. §§ 1692e, 1692e(8), 1692e(10), and 1692f, and is liable to Plaintiff therefor.

## SECOND COUNT
## Violation of Cal. Civ. Code § 1788.13(k)

172.    Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

173.    Cal. Civ. Code § 1788.13(k) prohibits debt collectors from the false representation that the consumer debt has been, is about to be, or will be sold, assigned, or referred to a debt collector for collection.

174.    MCM's credit reporting claimed that the Celtic Bank account, Synchrony Bank account, and First Bank account were sold to MCM.

175.    The representation that the Celtic Bank account, Synchrony Bank account, and First Bank account were sold to MCM is false, misleading, and/or deceptive.

176.    The intentional or negligent conduct of falsely representing that MCM is the current creditor of the debt, caused Plaintiff confusion, anxiety, worry, and emotional distress, causing Plaintiff to spend time to retain counsel, causing Plaintiff loss of time, in violation of Cal. Civ. Code § 1788.13(k).

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

177.   The false representation that the debt has been sold to MCM, violates Cal. Civ. Code § 1788.13(k).

178.   For the foregoing reasons, MCM violated Cal. Civ. Code § 1788.13(k), and are liable to Plaintiff therefor.

## THIRD COUNT
### Violation of Cal. Civ. Code § 1788.17

179.   Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

180.   Cal. Civ. Code § 1788.17 provides that a violation of the FDCPA is also a violation of the RFDCPA.

181.   MCM's conduct described herein violates the FDCPA, thus violating Cal. Civ. Code § 1788.17, making MCM liable to Plaintiff therefor.

## FOURTH COUNT
### VIOLATION OF 15 U.S.C. § 1681s-2(b)

182.   Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

183.   MCM violated 15 U.S.C. § 1681s-2(b) by continuing to report inaccurate information within Plaintiff's credit file with Equifax, Experian, and TransUnion; by failing to fully and properly investigate the Plaintiff's dispute; by failing to review all relevant information regarding Plaintiff's dispute; by failing to accurately respond to Plaintiff's dispute; by failing to correctly report results of an

accurate investigation to every credit reporting agency; and by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of its representations to the consumer reporting agencies.

184.  As a result of this conduct, action, and inaction of MCM, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from credit; and the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

185.  MCM's conduct, actions and/or inactions was willful, rendering it liable for actual or statutory, as well as punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent entitling the Plaintiff to recover actual damages under 15 U.S.C. § 1681o.

186.  Plaintiff is entitled to recover costs and attorney's fees from MCM in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## FIFTH COUNT
## VIOLATION OF Cal. Civ. Code §§ 1785.25(a) and 1785.31

187.  Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

188.  MCM violated Cal. Civ. Code § 1785.25(a) by furnishing information on a specific transaction or experience regarding the Celtic Bank account, Synchrony Bank account, and First Bank account to a consumer credit reporting agency when MCM knew or should have known that the information was inaccurate.

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

189.   Each and every occasion where MCM furnished inaccurate information about the Celtic Bank account, Synchrony Bank account, and First Bank account to a credit reporting agency is a separate violation under Cal. Civ. Code § 1785.31(2)(B).

190.   MCM's conducts, as described in this Complaint, was done willfully and knowingly.

191.   As a result of this conduct, action, and inaction of MCM, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from credit; and the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

192.   MCM's conduct, actions and/or inactions was willful, rendering it liable for actual or statutory, as well as punitive damages in an amount to be determined by the Court pursuant to Cal. Civ. Code § 1785.31(a)(2). In the alternative, it was negligent entitling the Plaintiff to recover actual damages under Cal. Civ. Code § 1785.31(a)(1).

193.   Plaintiff is entitled to recover costs and attorney's fees from MCM in an amount to be determined by the Court pursuant to Cal. Civ. Code § 1785.31(a)(2) and/or § 1785.31(a)(1).

## SIXTH COUNT
## Violation of Cal. Civ. Code § 1788.17

194.   Plaintiff repeats and realleges the foregoing paragraphs as if fully

restated herein.

195. The Plaintiff is a "consumer" as that term defined by the FDCPA.

196. MCM is a "debt collector" as that term is defined by the FDCPA.

197. The money sought from Plaintiff is a "debt" as that term is defined by the FDCPA.

198. Each report to the CRAs is a "communication" as that term is defined by the FDCPA.

199. The actions described herein constitute "an attempt to collect a debt" or "were taken in connection with an attempt to collect a debt" within the meaning of the FDCPA.

200. 15 U.S.C. § 1692d provides, generally, that a debt collector may not engage in conduct the natural consequence of which is to harass, abuse, and/or oppress.

201. 15 U.S.C. § 1692e provides, generally, that a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.

202. 15 U.S.C. § 1692e(8) prohibits a debt collector from communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

203.   15 U.S.C. § 1692e(10) prohibits the use of any false representation or deceptive means to collect or attempt to collect any debt.

204.   15 U.S.C. § 1692f prohibits using unfair or unconscionable means to collect or attempt to collect any debt.

205.   Celtic Bank violated the FDCPA by allowing MCM to report the Celtic Bank account, when Plaintiff did not owe MCM any money.

206.   Celtic Bank misrepresented the character, amount, and legal status of the Celtic Bank account, when it allowed MCM to report the account to the CRAs.

207.   Celtic Bank violated the FDCPA by using false representation or deceptive means when it allowed MCM to report information to the CRAs that Plaintiff owed money for a Celtic Bank account with an account number of 323393XXX.

208.   Celtic Bank violated the FDCPA by using false representation or deceptive means when it allowed MCM to report to the CRAs that Plaintiff owed money for a Celtic Bank account with an open date of July 27, 2023.

209.   Celtic Bank violated the FDCPA by engaging in conduct the natural consequence of which is to harass, abuse, and/or oppress by allowing MCM to report the Celtic Bank account after Celtic Bank already reported negative information regarding the account and ceased reporting the account, causing Plaintiff's credit score and creditworthiness to be negatively impacted for a second time for the same

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

account.

210.   Celtic violated the FDCPA by using unfair and/or unconscionable means by allowing MCM to report the Celtic Bank account after Celtic Bank already reported negative information regarding the account and ceased reporting the account, causing Plaintiff's credit score and creditworthiness to be negatively impacted for a second time for the same account.

211.   Cal. Civ. Code § 1788.17 provides that a violation of the FDCPA is also a violation of the RFDCPA.

212.   The conduct described herein violates the FDCPA, thus violating Cal. Civ. Code § 1788.17, making Celtic liable to Plaintiff therefor.

## SEVENTH COUNT
## NEGLIGENCE

213.   Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

214.   Creditors owe consumers a duty of reasonable care in the collection of debts.

215.   Celtic Bank owed a duty to Plaintiff to exercise reasonable care in its attempts to collect money from Plaintiff.

216.   Celtic Bank owed a duty to Plaintiff to exercise reasonable care in the transfer of Plaintiff's account to MCM.

217.   Celtic Bank owed a duty to Plaintiff not to transfer Plaintiff's account

to a debt collector that engages in deceptive acts and practices when attempting to collect debts, and engages in deceptive acts and practices when furnishing information to the CRAs.

218.  Celtic Bank breached these duties by transferring Plaintiff's account to MCM without any regard for the deceptive acts and practices that MCM engages in, and without any regard for the inaccurate and/or misleading information that MCM furnishes to the CRAs.

219.  As a direct and proximate result of Celtic Bank's negligence, Plaintiff suffered compensable harm and is entitled to recover actual, treble, exemplary, and punitive damages.

### EIGHTH COUNT
### Substantially Assisting Violations of the FDCPA, RFDCPA, and FCRA: Transfer of a Debt to a Debt Collector That Engages in False, Misleading, Deceptive, Unfair, Unconscionable, Harassing, Abusive, and/or Oppressive Conduct and Furnished Inaccurate and/or Misleading Information to the Credit Reporting Agencies

220.  Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

221.  Celtic Bank transfers pools of consumer debts to MCM for purposes of collection.

222.  Celtic Bank participates in the placing and transfer of consumer debt portfolios and has the authority to control the transfers.

223.  Celtic Bank exercises control over MCM regarding the accounts Celtic

Bank transfers to MCM by requiring reporting to Celtic Bank, auditing MCM, setting policies and procedures, and having the ability to recall accounts.

224.  Celtic Bank knows or should know that MCM engages in deceptive acts and practices by furnishing inaccurate and/or misleading information to the CRAs.

225.  MCM's reporting of the same account after Celtic Bank ceased reporting negative information has caused a negative impact on Plaintiff's credit score, and caused Plaintiff to be harmed twice for the same account.

226.  MCM's reporting of the same account after Celtic Bank ceased reporting negative information provides the appearance that MCM's reporting is a new negative account reporting.

227.  MCM's reporting of the same account after Celtic Bank ceased reporting negative information provided any third-party who viewed Plaintiff's credit reports with the reasonable belief that MCM's reporting was a new delinquent/defaulted account.

228.  MCM's reporting of the same account after Celtic Bank ceased reporting negative information will continue to provide any third-party who views Plaintiff's credit reports with the reasonable belief that Plaintiff has a new delinquent/defaulted account.

229.  MCM's subsequent reporting of the same account that Celtic Bank previously ceased reporting is inaccurate and/or misleading.

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

230.    Celtic Bank and MCM engage in these practices to harass, oppress, or abuse consumers.

231.    Celtic Bank and MCM engage in these practices to coerce consumers into paying debts because consumers are desperately trying to increase their credit scores.

232.    Celtic Bank knowingly or recklessly assisted MCM in MCM's deceptive acts and practices.

233.    As a direct and proximate result of Celtic Bank's conduct, Plaintiff suffered compensable harm and is entitled to recover actual, treble, exemplary, and punitive damages.

**NINTH COUNT**
**Violation of Cal. Civ. Code § 1788.17**

234.    Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

235.    The Plaintiff is a "consumer" as that term defined by the FDCPA.

236.    MCM is a "debt collector" as that term is defined by the FDCPA.

237.    The money sought from Plaintiff is a "debt" as that term is defined by the FDCPA.

238.    Each report to the CRAs is a "communication" as that term is defined by the FDCPA.

239.    The actions described herein constitute "an attempt to collect a debt" or

"were taken in connection with an attempt to collect a debt" within the meaning of the FDCPA.

240.   15 U.S.C. § 1692d provides, generally, that a debt collector may not engage in conduct the natural consequence of which is to harass, abuse, and/or oppress.

241.   15 U.S.C. § 1692e provides, generally, that a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.

242.   15 U.S.C. § 1692e(8) prohibits a debt collector from communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

243.   15 U.S.C. § 1692e(10) prohibits the use of any false representation or deceptive means to collect or attempt to collect any debt.

244.   15 U.S.C. § 1692f prohibits using unfair or unconscionable means to collect or attempt to collect any debt.

245.   Synchrony Bank violated the FDCPA by allowing MCM to report the Synchrony Bank account, when Plaintiff did not owe MCM any money.

246.   Synchrony Bank misrepresented the character, amount, and legal status of the Synchrony Bank account, when it allowed MCM to report the account to the

CRAs.

247.   Synchrony Bank violated the FDCPA by using false representation or deceptive means when it allowed MCM to report information to the CRAs that Plaintiff owed money for a Synchrony Bank account with an account number of 329146XXX.

248.   Synchrony Bank violated the FDCPA by using false representation or deceptive means when it allowed MCM to report to the CRAs that Plaintiff owed money for a Synchrony Bank account with an open date of September 25, 2024.

249.   Synchrony Bank violated the FDCPA by engaging in conduct the natural consequence of which is to harass, abuse, and/or oppress by allowing MCM to report the Synchrony Bank account after Synchrony Bank already reported negative information regarding the account and ceased reporting the account, causing Plaintiff's credit score and creditworthiness to be negatively impacted for a second time for the same account.

250.   Synchrony violated the FDCPA by using unfair and/or unconscionable means by allowing MCM to report the Synchrony Bank account after Synchrony Bank already reported negative information regarding the account and ceased reporting the account, causing Plaintiff's credit score and creditworthiness to be negatively impacted for a second time for the same account.

251.   Cal. Civ. Code § 1788.17 provides that a violation of the FDCPA is also

a violation of the RFDCPA.

252.   The conduct described herein violates the FDCPA, thus violating Cal. Civ. Code § 1788.17, making Synchrony liable to Plaintiff therefor.

<u>**TENTH COUNT**</u>
<u>**NEGLIGENCE**</u>

253.   Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

254.   Creditors owe consumers a duty of reasonable care in the collection of debts.

255.   Synchrony Bank owed a duty to Plaintiff to exercise reasonable care in its attempts to collect money from Plaintiff.

256.   Synchrony Bank owed a duty to Plaintiff to exercise reasonable care in the transfer of Plaintiff's account to MCM.

257.   Synchrony Bank owed a duty to Plaintiff not to transfer Plaintiff's account to a debt collector that engages in deceptive acts and practices when attempting to collect debts, and engages in deceptive acts and practices when furnishing information to the CRAs.

258.   Synchrony Bank breached these duties by transferring Plaintiff's account to MCM without any regard for the deceptive acts and practices that MCM engages in, and without any regard for the inaccurate and/or misleading information that MCM furnishes to the CRAs.

259.   As a direct and proximate result of Synchrony Bank's negligence, Plaintiff suffered compensable harm and is entitled to recover actual, treble, exemplary, and punitive damages.

## ELEVENTH COUNT
**Substantially Assisting Violations of the FDCPA, RFDCPA, and FCRA: Transfer of a Debt to a Debt Collector That Engages in False, Misleading, Deceptive, Unfair, Unconscionable, Harassing, Abusive, and/or Oppressive Conduct and Furnished Inaccurate and/or Misleading Information to the Credit Reporting Agencies**

260.   Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

261.   Synchrony Bank transfers pools of consumer debts to MCM for purposes of collection.

262.   Synchrony Bank participates in the placing and transfer of consumer debt portfolios and has the authority to control the transfers.

263.   Synchrony Bank exercises control over MCM regarding the accounts Synchrony Bank transfers to MCM by requiring reporting to Synchrony Bank, auditing MCM, setting policies and procedures, and having the ability to recall accounts.

264.   Synchrony Bank knows or should know that MCM engages in deceptive acts and practices by furnishing inaccurate and/or misleading information to the CRAs.

265.   MCM's reporting of the same account after Synchrony Bank ceased

reporting negative information has caused a negative impact on Plaintiff's credit score, and caused Plaintiff to be harmed twice for the same account.

266.   MCM's reporting of the same account after Synchrony Bank ceased reporting negative information provides the appearance that MCM's reporting is a new negative account reporting.

267.   MCM's reporting of the same account after Synchrony Bank ceased reporting negative information provided any third-party who viewed Plaintiff's credit reports with the reasonable belief that MCM's reporting was a new delinquent/defaulted account.

268.   MCM's reporting of the same account after Synchrony Bank ceased reporting negative information will continue to provide any third-party who views Plaintiff's credit reports with the reasonable belief that Plaintiff has a new delinquent/defaulted account.

269.   MCM's subsequent reporting of the same account that Synchrony Bank previously ceased reporting is inaccurate and/or misleading.

270.   Synchrony Bank and MCM engage in these practices to harass, oppress, or abuse consumers.

271.   Synchrony Bank and MCM engage in these practices to coerce consumers into paying debts because consumers are desperately trying to increase their credit scores.

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

272.  Synchrony Bank knowingly or recklessly assisted MCM in MCM's deceptive acts and practices.

273.  As a direct and proximate result of Synchrony Bank's conduct, Plaintiff suffered compensable harm and is entitled to recover actual, treble, exemplary, and punitive damages.

## JURY DEMAND

274.  Plaintiff hereby demands a trial of this action by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment be entered as follows:

a.  Finding MCM's actions violate the FDCPA; and

b.  Awarding damages to Plaintiff pursuant to 15 U.S.C. § 1692k; and

c.  Awarding Plaintiff's attorneys' fees pursuant to 15 U.S.C. § 1692k, calculated on a "lodestar" basis; and

d.  Finding MCM's actions violate the RFDCPA; and

e.  Finding Celtic Bank's actions violate the RFDCPA; and

f.  Finding Synchrony Bank's actions violate the RFDCPA; and

g.  Awarding damages to Plaintiff pursuant to Cal. Civ. Code § 1788.30(b); and

h.  Awarding Plaintiff's attorneys' fees pursuant to Cal. Civ. Code § 1788.30(c); and

i.  Finding MCM's actions violate the FCRA; and

j.  Awarding damages to Plaintiff pursuant to 15 U.S.C. § 1681n and/or 1681o; and

k.  Awarding Plaintiff's attorneys' fees pursuant to 15 U.S.C. §
    1681n(a)(3) and/or 1681o(a)(2), calculated on a "lodestar"
    basis; and

l.  Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2); and

m.  Finding MCM's actions violate Cal. Civ. Code § 1785.25; and

n.  Actual    damages    pursuant    to    Cal.    Civ.    Code    §§
    1785.31(a)(2)(A) and/or 1785.31(a)(1); and

o.  Punitive damages of $5,000.00 for each violation pursuant to
    Cal. Civ. Code § 1785.31(a)(2)(B); and

p.  Awarding Plaintiff's attorneys' fees pursuant to Cal. Civ.
    Code §§ 1785.31(a)(2) and/or § 1785.31(a)(1); and

q.  Actual, treble, exemplary, and punitive damages on Plaintiff's
    negligence causes of action against Celtic Bank, and Synchrony
    Bank; and

r.  Actual, treble, exemplary, and punitive damages on Plaintiff's
    Substantially Assisting Violations of the FDCPA, RFDCPA, and
    FCRA causes of action against Celtic Bank, and Synchrony Bank;
    and

s.  Awarding Plaintiff punitive damages to be determined at trial, for the
    sake of example and punishing defendant for its malicious conduct,
    pursuant to Cal. Civ. Code § 3294; and

t.  Awarding the costs of this action to Plaintiff; and

u.  Awarding pre-judgment interest and post-judgment interest to
    Plaintiff; all together with

v.  Such other and further relief that the Court determines is just and
    proper.

DATED: February 6, 2026

By: */s/ Ely Grinvald*
Ely Grinvald, Esq.
2355 Westwood Blvd., #562
Los Angeles, CA 90064
Phone: (310) 405-5684
grinvaldely@gmail.com

*Attorneys for Plaintiff*
*Gloria Alvarado*

- 46 -

FIRST AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL